UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

IN RE MEDCO HEALTH SOLUTIONS, INC.,
PHARMACY BENEFITS MANAGEMENT LITIGATION

------------------------------------------------------------------------x

03-MDL-1508 (CS)

**MEMORANDUM DECISION
AND ORDER**

<u>Appearances</u>:

Edward J. Normand, Esq.
Boies Schiller & Flexner, LLP
Armonk, New York

Karin E. Fisch, Esq.
Abbey Spanier Rodd & Abrams LLP
New York, New York

Kenneth P. Ross, Esq.
The Coleman Law Firm
Chicago, Illinois

Eugene I. Pavalon, Esq.
Pavalon, Gifford, Laatsch & Marino
Chicago, Illinois

Linda J. Cahn, Esq.
The Cahn Firm
Morristown, New Jersey

Stephen Lowey, Esq.
Lowey Dannenberg Cohen & Hart, LLC
White Plains, New York

David A. McKay, Esq.
Maury Herman, Esq.
Steve Herman, Esq.
Herman, Mathis, Casey, Kitchens & Gerel, LLP
Atlanta, Georgia

William H. Narwold, Esq.
Motley Rice LLC
Hartford, Connecticut

Gary W. Kendall, Esq.
Michie Hamlett Lowry Rasmussen & Tweet PLLC
Charlottesville, Virginia

*Counsel for Plaintiffs*

James P. Tallon, Esq.
Shearman & Stearling LLP
New York, New York

*Counsel for Defendants*

Seibel, J.

Before the Court for approval is the Modified Allocation Plan, which represents the settlement reached between the Insured and Capitated Plans Subclass ("Insured Subclass") and the Self-Funded Plans Subclass ("Self-Funded Subclass") as to the allocation of settlement proceeds in this action. Also before the Court are the Amended and Unobjected Motion to Issue Revised Notice of Application for Attorneys' Fees and Hearing to the Self-Funded Plan Subclass filed on November 26, 2008 (Doc. 188), the Motion for Reconsideration filed by Plaintiff Harry J. Blumenthal, Jr., as trustee for the Blumenthal Print Works Inc. Employee Benefit Plan ("Blumenthal Plan") on October 23, 2008 (Doc. 179), and the Motion for Attorneys' Fees filed by the Herman Mathis Group on June 16, 2008 (Doc. 174).


**I.  Background**

Familiarity with prior proceedings and rulings in this matter is assumed. Plaintiffs, the trustees and beneficiaries of a number of employee welfare benefit plans, brought this class action against Defendants Merck-Medco Managed Care, L.L.C., also known as Medco Health Solutions, Inc., and its former parent company, Merck & Co. (together, "Medco"), pursuant to

the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1000 *et. seq*.

Plaintiffs allege that Medco breached its fiduciary duties under ERISA by failing to act in

Plaintiffs' best interests when providing pharmacy benefit management services.  While

promising to control the rising costs of prescription drugs, Medco allegedly used its

discretionary authority over certain aspects of the Plans' management to benefit its parent

company, Merck & Co., without disclosing such practices to Plaintiffs.

On May 25, 2004, the Honorable Charles L. Brieant[1] approved the Settlement Agreement

between Medco and a class consisting of all employee welfare benefit plans that contracted with

Medco, either directly or indirectly, where such contracts were:  (1) in force at any time between

December 17, 1994, and the date of the final approval of the Settlement Agreement; and (2)

subject to ERISA (the "Class").  (Doc. 105.)  Pursuant to the Settlement Agreement, which was

reached by the Parties under the direct supervision of court-appointed Special Master Charles

Moerdler and with the involvement of Judge Brieant, Medco agreed to modify its business

practices and pay $42.5 million into a Settlement Fund to be paid to the Class.  In exchange, the

Class agreed to release all claims against Medco arising under ERISA or from the transactions or

occurrences that were the subject of the this action.[2]  The Settlement Agreement (Doc. 35)

provides that the Settlement Fund was to be allocated primarily on the basis of each settling

plan's proportionate share of the total drug spend of all settling plans for the class period

---

[1]  This case was originally assigned to Judge Brieant, who passed away on July 20, 2008.
The case was reassigned to me on September 8, 2008.  (Doc. 176.)

[2]  Plaintiffs also agreed to release claims against third-party administrators and plan
sponsors that arose from or were related to the conduct of Medco that is the subject of this
litigation.  Plaintiffs did not, however, release any antitrust or contract claims.

(Settlement Agreement ¶ 13).  Judge Brieant authorized Class counsel to seek up to 30% of the Settlement Fund in attorneys' fees.

On July 31, 2003, Judge Brieant issued an Order preliminarily approving the Settlement Agreement and authorizing notice to the Class.  (Doc. 34.)  The Notice of Pendency of Class Action, Proposed Class Settlement and Hearing ("Notice") advised potential class members of the proposed Settlement Agreement and fairness hearing, and of their rights to opt out of or object to the proposed Settlement Agreement.  The Notice also stated that the Settlement Fund would be allocated between the self-funded[3] and insured/capitated[4] plans based on the total drug spend of each plan, but that the proportionate share of the insured/capitated plans would be reduced by 55% to reflect that those plans were not damaged directly by Medco's alleged misconduct.

A fairness hearing was held on December 11, 2003 and continued on May 6, 2004, during which a number of objections to the Settlement Agreement were made.  Specifically, Sweetheart Cup Company, Iron Workers Tri-State Welfare Fund, and Central States Southeast and Southwest Areas Health & Welfare Fund (together, the "Self-Funded Plans") objected to the Settlement Agreement and certification of the Class on the basis that the allocation between the self-funded plans and the insured/capitated plans was unfair, inadequate and unreasonable.  (Aff.

---

[3]  Self-funded plans did not pay set premiums to Medco.  Instead, they paid Medco directly, or indirectly through a third-party administrator, for the prescription drugs used by their beneficiaries.  The self-funded plans thus bore the risk of higher prescription drug costs.

[4]  Insured plans paid set premiums to their insurance companies in exchange for full payment of their beneficiaries' prescription costs, and the insurance companies in turn contracted with Medco.  Capitated plans paid set premiums directly to Medco in exchange for full payment of their beneficiaries' prescription drug costs.  The insurance companies or Medco, not the insured or capitated plans, thus bore the risk of higher prescription drug costs.

of Kenneth P. Ross in Supp. of the Modified Plan of Allocation ("Ross Aff.") ¶ 15.)  The Self-Funded Plans argued that the Settlement Agreement favored the insured and capitated plans over the self-funded plans.  They asserted that because the insured/capitated plans did not pay for prescription drugs directly, they suffered no damages and, therefore, their share in the settlement should be less.  Moreover, they contended that there should have been at least some explanation as to how the 55% reduction of the insured or capitated plans' claims was decided upon.  (*Id.* ¶¶ 16-17.)  They also sought to intervene in the action to represent the self-funded plans, arguing that their separate interests were not being adequately advanced.  (*Id.* ¶ 18.)

On May 25, 2004, Judge Brieant issued a Memorandum and Order certifying the Class and approving the Settlement Agreement on the basis that it was a fair, reasonable and adequate settlement of the claims.  (Doc. 105.)  As proposed, the settlement fund was to be allocated primarily on the basis of each settling plan's proportionate share of the total drug spend of all settling plans for the class period, with the allocation received by the insured/capitated plans reduced by 55% to reflect the fact that they were not directly harmed by Medco's alleged misconduct.  Judge Brieant found that the 55% reduction was a reasonable discount and that the self-funded plans' interests were adequately represented.  With respect to attorneys' fees, he determined that $12.75 million – 30% of the total Settlement Fund – was fair and reasonable.  Out of that amount, Judge Brieant awarded legal fees to Linda J. Cahn in the amount of $160,880 and to the law firms of Lowey Dannenberg Bemporad & Selinger and Rawlings & Associates (the "Lowey Firm") in the amount of $637,500, with the remainder of the $12.75 million going to the law firms of Abbey Gardy LLP and Boies, Schiller & Flexner LLP.

The Self-Funded Plans and Ms. Cahn[5] appealed from Judge Brieant's Order.[6]  On

October 4, 2007, the Court of Appeals issued a decision holding that the Class was erroneously

certified without considering the conflicts of interest among the members of the Class.

Specifically, the Self-Funded Plans' argument that the insured and capitated plans were not

entitled to any recovery was inadequately advanced because none of the class representatives

were part of an exclusively self-funded plan.  The Court of Appeals "remand[ed] [the case] to the

District Court for certification of a subclass encompassing the self-funded plans in order to better

protect their claims in this litigation."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v.*

*Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007).  In addition, the Court

of Appeals found that the Settlement Agreement failed to adequately explain the 55% allocation

discount for the insured and capitated plans.  Not having "record evidence relating to the basis

for the 55% reduction or the benefit of a more elaborate explanation of this discount by the

District Court to allow [the Court of Appeals] to determine whether it represent[ed] a fair,

---

[5]  Although Ms. Cahn attempted to appeal Judge Brieant's approval of the Settlement Agreement, the Court of Appeals struck all portions of her brief except those related to her own claim for attorney's fees, because her client, the Blumenthal Plan, had opted out of the Settlement Agreement and therefore "lack[ed] standing to pursue claims relating to the standing of the class plaintiffs, the typicality of their claims, and the propriety of the fee award to class counsel."  February 17, 2005 Order of Court of Appeals for the Second Circuit; *see Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 185 n.1 (2d Cir. 2005).

[6]  The Court of Appeals issued a decision on December 8, 2005, remanding the case to the district court for consideration of whether the Class representatives had Article III standing to assert ERISA claims and to enter into the Settlement Agreement on behalf of the Class.  *Cent. States Se. & Sw. Areas Health & Welfare Fund*, 433 F.3d at 181.  On remand, Judge Brieant found that all of the Class representatives had standing, and the appeal was reinstated.  The Court of Appeals affirmed Judge Brieant's standing decision as it pertained to Marissa Janazzo, a plan trustee, and declined to reach the issue as to the other named plaintiffs.  *See Cent. States Se. & Sw. Areas Health & Welfare Fund*, 504 F.3d at 241-43.

reasonable, and adequate discount," the Court of Appeals remanded for "necessary findings and an explanation in support of any reduction in the shares of the insured or capitated Plans." *Id.* at 248.  The Court of Appeals explained that the size of the Settlement Fund should not be renegotiated on remand, but that the "new subclass [should] be free on remand to negotiate only for a reallocation of the settlement proceeds, with any agreed change subject to the reasoned approval of the District Court."[7] *Id.*   Further, it noted that "counsel retained to represent the interests of the new subclass on remand also may be entitled to recover reasonable attorneys' fees," but left "it to the District Court's informed discretion to determine how to accommodate a fee claim by counsel for the subclass within the 30% cap provided in the Settlement Agreement." *Id.* at 249-50.

On March 17, 2008, Judge Brieant certified the Self-Funded Subclass, appointed the Self-Funded Plans as representatives of the Self-Funded Subclass, and appointed the Coleman Law Firm and the law firm of Pavalon, Gifford & Laatsch as counsel for the Self-Funded Subclass.  (Doc. 167.)  Meanwhile, counsel for the Subclasses engaged in negotiations regarding the allocation of the Settlement Funds and ultimately agreed that the Insured Subclass would be subject to an 85% discount (the "Modified Allocation Plan").  Judge Brieant entered an Order on April 1, 2008, finding on a preliminary basis that the proposed Amended Settlement Agreement (encompassing the Modified Allocation Plan) was within the range of possible fair, reasonable and adequate settlements of the Class's claims.  (Doc. 170.)  A hearing regarding the fairness of the proposed Amended Settlement Agreement was scheduled for May 20, 2008, and a notice of

---

[7]  The Court affirmed the award of attorneys' fees to class counsel and the award of attorneys' fees to Ms. Cahn.  *Id.* at 249-50.

the proposed Amended Settlement Agreement ("Notice of Amendment") was ordered to be

mailed to the 24,000 Insured Subclass members who would be negatively affected by the

Modified Allocation Plan.

On May 6, 2008, the Blumenthal Plan, which had opted out of the Settlement Agreement

before the final judgment certifying the Class and approving the Settlement Agreement, filed

Objections to the proposed Amended Settlement Agreement on the basis that the Notice of

Amendment should have been sent to all of the potential class members, including the plans that

had opted out or had not filed claims, so that they could reconsider whether to opt out or to file

claims in light of the terms of the Modified Allocation Plan.  (Doc. 171.)  The Self-Funded Plans

filed a response to those Objections on May 15, 2008.  (Doc. 172.)  Also, on May 15, 2008,

Plaintiffs Bellow and O'Hare filed a Memorandum of Law in Support of the Amended

Settlement.  (Doc. 173.)

At the May 20, 2008 hearing regarding the fairness of the proposed Amended Settlement

Agreement – specifically, the Modified Allocation Plan – no member of the Insured Subclass

presented any objections.  Judge Brieant reserved decision with respect to his approval of the

Modified Allocation Plan.  He did, however, determine that the Blumenthal Plan was not entitled

to notice, and that no additional notice would be issued.  (May 20, 2008 Hr'g Tr. 32:12-21.)  The

Self-Funded Subclass having been certified, a reallocation of the Settlement Fund having been

negotiated, and a fairness hearing having been conducted, the Modified Allocation Plan is now

before the Court for its "reasoned approval."  *Cent. States Se. & Sw. Areas Health & Welfare

Fund*, 504 F.3d at 248.

**II.  Modified Allocation Plan**

    **A.  Standard of Review**

Pursuant to Federal Rule of Civil Procedure 23(e), a class action may be settled "only with the court's approval."  If the settlement binds the class members, "the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The decision of whether to approve a class action settlement, "lies within the discretion of the trial court . . . and should be exercised in light of the general policy favoring settlement."  *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 509-10 (E.D.N.Y. 2003).  "In making this determination, a court must neither rubber stamp the settlement nor engage in 'the detailed and thorough investigation that it would undertake if it were actually trying the case.'"  *Id.* (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974)).  "Courts determine the fairness of a settlement by looking both at the terms of the settlement and the negotiation process leading up to it."  *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008).  "With respect to process, a class action settlement enjoys a presumption of correctness where it is the product of arm's-length negotiations conducted by experienced, capable counsel."  *Id.* (internal quotation marks omitted).

As with all aspects of settlement, "the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable under the particular circumstances of the case."  *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d at 518 (internal quotation marks omitted); *accord Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) ("To warrant approval, the plan of allocation must also meet the standards by which the . . . settlement was scrutinized – namely, it must be fair and adequate.").  "A plan of

allocation should be based on the nature and extent of class members' provable damages." *In re Luxottica Group S.p.A. Secs. Litig.*, 233 F.R.D. 306, 317 (E.D.N.Y. 2006). "[A] plan of allocation need not[, however,] be perfect." *In re EVCI Career Coll. Holding Corp. Sec. Litig.*, No. 05-CV-10240, 2007 U.S. Dist. LEXIS 57918, at *32 (S.D.N.Y. July 27, 2007). Rather, "[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Bayer AG Secs. Litig.*, No. 03-CV-1546, 2008 U.S. Dist. LEXIS 101350, at *8 (S.D.N.Y. Dec. 15, 2008); *accord Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 65 (S.D.N.Y. 2003); *see also In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001) ("The opinion of experienced and informed counsel is entitled to considerable weight."). Like other aspects of a settlement agreement, approval of the allocation plan "rest[s] in the sound discretion of the trial court." *In re Am. Bank Note Holographics*, 127 F. Supp. 2d at 429.

**B. Analysis**

**1. The Modified Allocation Plan Was the Result of Arm's-Length Negotiations**

With respect to class action settlements, "the negotiation process must be examined in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d at 510 (internal quotation marks omitted). Here, experienced counsel for each Subclass have provided ample evidence of the vigor with which they negotiated the Modified Allocation Plan, and of the lack of any collusion or coercion in the process. On May 15, 2008, counsel for the Insured Subclass filed a Memorandum in Support of Modified Plan of Allocation, which describes the arm's-length negotiations which

resulted in the Modified Allocation Plan.  (Doc. 173.)  In addition, Mr. Ross, counsel for the

Self-Funded Subclass, filed an Affidavit in Support of the Modified Plan of Allocation dated

November 24, 2008.  (Doc. 187.)  It also sets forth a summary of the arm's-length negotiations

that took place between counsel for the Insured Subclass and the Self-Funded Subclass that led

to the proposed reallocation of the Settlement Fund.

On February 6, 2008, following Judge Brieant's appointment of the Self-Funded Plans as

representatives of the Self-Funded Subclass and of the Coleman and Pavalon Firms as counsel

for the Subclass, a conference, supervised by Judge Brieant, was held during which counsel for

the Subclasses discussed their divergent positions as to whether the Insured Subclass would be

able to demonstrate that it suffered damages as a result of Medco's alleged misconduct.  (Ross

Aff. ¶¶ 22-24.)  "Vigorous negotiations" ensued and counsel for the Self-Funded Subclass

expressed their commitment to litigating the issue.  (*Id.* ¶ 24.)  Thereafter, counsel exchanged

certain information, including preliminary data  – not available when the original Settlement

Agreement was negotiated – showing that under the original Settlement Agreement only

approximately 7.5% of the Settlement Fund would be disbursed to the Insured Subclass, while

the remainder would be disbursed to the Self-Funded Subclass.[8]  (*Id.* ¶ 25; *id.* Exs. A, B.)  A

telephone conference was held on February 12, 2008.  (*Id.* ¶ 25.)  Counsel continued to confer

daily by email and telephone.  (*Id.* ¶ 26.)  On February 20, 2008, counsel for both Subclasses met

again with Judge Brieant.  During this meeting, counsel for the Insured Subclass proposed an

---

[8]  The preliminary data shows that although the Insured Subclass is much larger in terms
of members, the Self-Funded Subclass had a much greater drug spend during the Class period,
the result of which is that under the terms of the original Settlement Agreement, approximately
92.5% of the Settlement Funds would be distributed to the Self-Funded Subclass, while only
approximately 7.5% would be distributed to the Insured Subclass.  (Ross Aff. Ex. B)

increase to the discount, which counsel for the Self-Funded Subclass considered and rejected as insufficient.  (*Id.*)  Counsel for the Self-Funded Subclass thereafter made a counter-offer.  (*Id.* ¶ 29.)  On March 10, 2008, counsel for the Insured Subclass sent to counsel for the Self-Funded Subclass an analysis of a range of percentage discounts and the impact of those possible discounts on the recovery of the Self-Funded Plans.  (*Id.* ¶ 30; *id.* Exs. C, D.)  On March 12, 2008, a hearing was held before Judge Brieant, and negotiations continued at that time.  (*Id.* ¶ 31.)  Ultimately, after additional negotiations, counsel informed Judge Brieant that the Subclasses had agreed to an 85% discount of the Insured Subclass' drug spend, which would result in the distribution of an estimated 3.64% (or $1,091,806) of the Settlement Fund, plus accrued interest, to the Insured Subclass.  (*Id.* ¶ 32; *id.* Ex. C.)

Counsel for the Self-Funded Subclass contends that as a result of its efforts, the Self-Funded Subclass will obtain an additional $4.7 million over the amount originally allocated to it under the Settlement Agreement.  According to counsel for the Self-Funded Subclass, the increased discount to the Insured Subclass resulted in approximately $2.2 million being shifted to the Self-Funded Subclass.  The other $2.5 million is a result of unknown claimants – in other words, plans that had made claims but not documented that they were self-funded despite having ample opportunity to do so – being assigned to the Insured Subclass.

In his affidavit, Ross avers that the negotiations between counsel were "long, complex, arduous, and at all times" were conducted at arm's length.  (*Id.* ¶ 33.)  He emphasizes that "[w]hile there was cooperation between counsel for both parties in analyzing the claims data and making themselves available for negotiation discussions, there was no collusion."  (*Id.*)  Similarly, counsel for the Insured Subclass assert that they "engaged in vigorous negotiations,"

which were conducted at arm's-length.  (Mem. in Supp. of Modified Plan of Allocation 3, 10.)

In addition, these negotiations were at times supervised by Judge Brieant, which lends credit to

their integrity.  *See Banyai v. Mazur*, No. 00-CV-9806, 2008 U.S. Dist. LEXIS 93593, at *21

(S.D.N.Y. Nov. 18, 2008) (supervisory role of federal judges during settlement talks was factor

in determination that settlement process was procedurally fair and counsel acted in class's best

interests).  Based on this evidence and my overall impression of the negotiations from the record,

I find that the Modified Allocation Plan was the product of arm's-length negotiations conducted

by "experienced plaintiffs' counsel who are familiar with the relative strengths and weaknesses

of the potential claims of Class members."  *Maley*, 186 F. Supp. 2d at 367.  Accordingly, the

Modified Allocation Plan is entitled to a "presumption of correctness."  *In re Telik, Inc. Sec.

Litig.*, 576 F. Supp. 2d at 575.

### 2.  There is a Reasonable and Rational Basis for the Modified Allocation Plan

Although the Self-Funded Plans argued that the Insured Subclass suffered no damages

and the Insured Subclass argued that it had been damaged significantly, the Subclasses

ultimately agreed to the 85% discount based on the available evidence as well as a number of

uncertainties and difficulties inherent in continuing the litigation.  Counsel conveyed these

considerations to Judge Brieant at the May 20, 2008 hearing "to ascertain the fairness of a

settlement, which . . . the subclass representatives . . . reached" (May 20, 2008 Hr'g Tr. 6:11-13),

and to this Court by the Affidavit of Mr. Ross (Doc. 187) and the Insured Subclass's

Memorandum in Support of Modified Plan of Allocation (Doc. 173).  After reviewing counsel's

bases for the 85% discount, I find that it is fair, reasonable and rational for the following reasons.

First, the 85% discount is commensurate with the amount of damages each Subclass

likely suffered.  Allocation plans which distribute settlement funds based on the nature and

extent of the class members' damages have been found to be reasonable.  *See, e.g., In re Gulf

Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992) (allocation plan

reasonable where most of settlement was allocated to those directly injured and those with

strongest claims).  Any damages suffered by the Self-Funded Subclass were direct, in the form of

higher drug acquisition costs, whereas any damages suffered by the Insured Subclass were

indirect, in the form of higher insurance premiums.  (Mem. in Supp. of Modified Plan of

Allocation 4.)  Thus, the 85% discount appropriately reflects the fact that any damages suffered

by the Insured Subclass were indirect and far less in amount than those suffered by the Self-

Funded Subclass.  *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d at 580 ("A reasonable plan

may consider the relative strength and values of different categories of claims."); *In re EVCI*,

2007 U.S. Dist. LEXIS 57918, at *33-34 (allocation plan approved where it reflected counsels'

damages theory based on extensive investigation); *Maley*, 186 F. Supp. 2d at 367 (allocation

plan approved where it reflected damages theory of case).

      Second, the 85% discount accounts for the risks associated with litigating the issue of

damages.  While the Self-Funded Subclass maintained that the Insured Subclass did not sustain

any damages, the former Subclass acknowledges that there is some evidence to show that the

latter Subclass did.  For example, an expert on the relevant custom and practice in the industry

testified that Medco's alleged misconduct harmed the Insured Subclass by causing its members

to pay higher insurance premiums.  (Doc. 173 (Class Counsel's Proposed Findings of Fact and

Conclusions of Law) ¶ 56; May 20, 2008 Hr'g Tr. 10:12-16.)  Similarly, while the Insured

Subclass believed that it suffered damages, it also believed there was "a meaningful chance that .

. . the District Court could rule that the insured plans sustained no damages as a result of Medco's alleged conduct."  (Mem. in Supp. of Modified Plan of Allocation 4.)  Had the Subclasses litigated this issue, they would have had to retain experts, the damage assessments of whom would likely have varied substantially, thus precipitating a "battle of experts."  In such a battle, counsel for both Subclasses recognize the possibility that a factfinder might be persuaded by the experts for the other Subclass.  Thus, the 85% discount fairly accounts for the risk to both Subclasses of litigating the issue of damages sustained by the Insured Subclass.  *See In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F. Supp. 2d at 418 (approving settlement where there was substantial risk of establishing damages).

Third, the 85% discount reflects the fact that there would be considerable delay and costs associated with litigating the issue of whether the Insured Subclass sustained damages, and if so, how much.  (Ross Aff. ¶ 27; May 20, 2008 Hr'g Tr. 10:6.)  For example, industry-wide prescription benefits managers and insurance companies' pricing data, as well as expert actuarial and economic analysis of that data, would have been required.  (Ross Aff. ¶ 27.)  Counsel for the Self-Funded Subclass determined that the cost of continued litigation over the Insured Subclass' estimated $1,091,806 share of the Settlement Fund would likely exceed that amount and unnecessarily deplete the Self-Funded Subclass' share of the Settlement Fund.  (*Id.* ¶ 32.)  Moreover, counsel for both Subclasses did not want to further delay the disbursement of the Settlement Fund, which had been held in escrow since late 2003.  (*Id.* ¶ 27.)

Fourth, both Medco and the Insured Subclass were insistent that the Insured Subclass obtain from the Settlement Agreement some monetary relief beyond the equitable relief that would benefit the all Class members, including the non-claimants.  Medco was concerned that

absent some additional recovery, the Insured Subclass could later dispute the *res judicata* effect of the Settlement Agreement on the grounds that it had received no consideration for the release of its claims.  (*Id.* ¶ 28; May 20, 2008 Hr'g Tr. 10:3-10.)  In addition, if the discount had been 100% and the Insured Subclass had been notified that it was not receiving any monetary relief from the Settlement Agreement, there could well have been objections to the Modified Allocation Plan, which would have resulted in additional delay and expense.  (May 20, 2008 Hr'g Tr. 9:23-10:2.)

Finally, notice of the proposed Modified Allocation Plan was sent to the approximately 24,000 Insured Subclass members, none of which objected to the fairness of the 85% discount.[9] (*Id.* 11:13-21; 24:13-24.)   In determining the reasonableness of allocation plans, "[c]ourts also consider the reaction of a class to a plan of allocation."  *In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *34 (approving allocation plan as reasonable where there were no objections to it); *Maley*, 186 F. Supp. 2d at 367 (same).  The absence of any objections to the fairness of the 85% discount is further evidence of its fairness and reasonableness.

*     *     *

In sum, counsel for the Insured and Self-Funded Subclasses have demonstrated both that the Modified Allocation Plan was arrived at through vigorous and arm's-length negotiations by capable and experienced counsel, and that it has a reasonable and rational basis.  Thus, I approve it.

---

[9]  As discussed in detail below, the Blumenthal Plan filed an objection to the Modified Plan of Allocation.  That objection was not, however, to the fairness of the 85% discount, but to the fact that notice was sent only to the Insured Subclass, rather than all potential members of the Class.  (Doc. 171.)

### III.  Motion to Issue Revised Notice to Self-Funded Subclass

Having approved the Modified Allocation Plan, I now turn to the October 23, 2008

Motion of the Self-Funded Plans and their Counsel to Issue Revised Notice of Application for

Attorneys' Fees and Hearing to the Self-Funded Plan Subclass.  Counsel for the Self-Funded

Subclass seek permission of the Court to notify the members of the Subclass of their intent to file

a fee application and of a hearing to be held regarding that application.   Pursuant to the Court's

suggestion, counsel for the Self-Funded Subclass and counsel for the Insured Subclass have

exchanged drafts of the proposed Revised Notice of Application for Attorneys' Fees and Hearing

("Revised Notice"), and counsel for the Insured Subclass have expressed no objections to it.

#### A.  Standard for Determining Adequacy of Notice of a Fee Application

Federal Rule of Civil Procedure 23(h)(1) and Local Civil Rule 23.1 provide that in a class

action, notice of a fee application must be provided to the class.  *In re Excess Value Ins.*

*Coverage Litig.*, 598 F. Supp. 2d 380, 391-92 (S.D.N.Y. 2005).  Pursuant to Rule 23(h)(1),

"[n]otice of the motion [for an award of attorney's fees] must be served on all parties and, for

motions by class counsel, directed to class members in a reasonable manner."  Fed. R. Civ. P.

23(h)(1).  Similarly, Local Civil Rule 23.1 provides that after a settlement, attorney's fees should

not be paid except as permitted "by the court after a hearing upon such notice as the court may

direct."  Local Civil Rule 23.1.  "The notice shall include a statement of the names and addresses

of the applicants for such fees and the amounts requested respectively and shall disclose any fee

sharing agreements with anyone."  *Id.*

The requirements for notice of a fee application pursuant to Rule 23(h) are parallel to

those for notice of a settlement pursuant to Rule 23(e).  Notes of Advisory Committee on 2003

amendments to Fed. R. Civ. P. 23.  The standard for the adequacy of such notices is

"reasonableness."  *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 113-14 (2d Cir.

2005).  "There are no rigid rules to determine whether a settlement notice to the class satisfies . .

. Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of

the class of the terms of the proposed settlement and of the options that are open to them in

connection with the proceedings."  *Id.* at 114 (internal quotation marks omitted).   "Notice is

adequate if it may be understood by the average class member."  *Id.* (internal quotation marks

omitted).

### B.  Analysis

The Revised Notice is adequate insofar as it describes the general basis for the motion –

the work done and results achieved by counsel on behalf of the Self-Funded Subclass – and that

counsel will seek an amount not to exceed $1.5 million to be paid from the Self-Funded

Subclass' share of the settlement proceeds.  It also properly informs the members of the Self-

Funded Subclass of the options open to them – they may either take no action at all or object in

writing to the fee application – and that electing either option will not affect their entitlement to

settlement proceeds pursuant to the Settlement Agreement.

To fairly and reasonably apprise the Self-Funded Subclass of counsels' intended motion

for an award of attorney's fees, however, certain relevant information must be added.  Most

importantly, the proposed Revised Notice lacks an explanation of the significance of the fact that

counsel seeks an award of fees from the Self-Funded Subclass' share of the settlement proceeds.

Such an award would result in the Self-Funded Subclass paying more in attorney's fees than the

Insured Subclass and would exceed the cap (30% of the $42.5 million, or $12.75 million) set in

the original Settlement Agreement and approved by the Court of Appeals.  After directing the

certification of a Self-Funded Subclass, the Court of Appeals "[left] it to the District Court's

informed discretion to determine how to accommodate a fee claim by counsel for the subclass

*within the 30% cap provided in the Settlement Agreement*."  *Cent. States Se. & Sw. Areas Health

& Welfare Fund*, 504 F.3d at 249-50 (emphasis added).  Counsel for the Self-Funded Subclass,

having agreed with counsel for the Insured Subclass not to seek an award of attorney's fees from

the approved $12.75 million, but rather from the Self-Funded Subclass' share of the settlement

proceeds, thus seek an award of attorney's fees above and beyond the 30% limit provided for in

the Settlement Agreement and approved by the Court of Appeals.[10]  To fairly and reasonably

apprise the Self-Funded Subclass of the application for attorney's fees, the Revised Notice must

include an explanation of these relevant facts.

  In addition, the proposed Revised Notice lacks a sufficient explanation of how Subclass

counsel calculated the increased benefits it achieved for the Self-Funded Subclass.  The Revised

Notice informs the Self-Funded Subclass that counsel achieved an additional $4.7 million benefit

that it would not have received under the original Settlement Agreement.  The Revised Notice

explains that this $4.7 million benefit is the "result of the increase of the discount to the insured

plans' recovery and reclassification of certain Plans that did not properly identify themselves as

insured Plans."  (Revised Notice 3.)  More specifically, counsel for the Self-Funded Subclass

---

[10]  In other words, $12.75 million would come off the top of the $42.5 million Settlement
Fund, with the remainder allocated between the two Subclasses and the fee for the Self-Funded
Subclass' counsel coming from that Subclass's allocated share.  Accordingly, the Self-Funded
Subclass would pay its proportionate share of the $12.75 million to the original Class counsel,
plus an additional fee to its Subclass counsel.  If I approved a $1.5 million fee for Subclass
counsel, the total fees ($12.75 million plus $1.5 million) would total 33.5% of the $42.5 million
Settlement Fund, exceeding the 30% cap.

advised the Court that the $4.7 million claimed benefit is comprised of: (1) $2.2 million obtained

by the Self-Funded Subclass as a result of the increase (from 55% to 85%) in the discount

applied to the drug spend of the Insured Subclass; and (2) $2.5 million obtained by the Self-

Funded Subclass as a result of 298 plans being reassigned from the Self-Funded Subclass to the

Insured Subclass.  (Oct. 6, 2008 Hr'g Tr. 14:15-15:3.)  The proposed Revised Notice does not

provide this detail.  Moreover, when pressed by the Court, counsel for the Insured Subclass

advised that they believe, as a factual matter, that the reclassification of the 298 plans was not

achieved by counsel for the Self-Funded Plans.  They contend that the reassignment process was

under way and would have occurred regardless of the efforts of the Self-Funded Subclass'

counsel.  (*Id.* 53:16-54:6.)  Given this dispute, the Revised Notice should be amended to include

an explanation of which portion of the $4.7 million benefit is the result of the increased discount

and which portion is the result of the reclassification of the 298 plans.[11]  Moreover, it should

state that counsel for the Insured Subclass believes that the reclassification would have occurred

anyway.[12]

---

[11]   The Court understood from the colloquy at the October 6, 2008 conference that this information would be included in the proposed Revised Notice.  (*See* Oct. 6, 2008 Hr'g Tr. 61:23-62:4 (The Court:  ". . . .  So I don't expect you folks to agree on the underlying facts, but if you can agree to some kind of wording that you know will not give the insured [Sub]class chest pain, but will give the information to the self-funded plans to show where the numbers came from, that will just get us down the road in one step rather than two."  Mr. Ross:  "That's fine, your Honor." ).)

[12]   The Court had understood from the colloquy at the October 6, 2008 conference that this information would also be included in the proposed Revised Notice.  (*See, e.g., id.* 60:7-11, 61:10-13 (Mr. Ross: "Perhaps what we should do – and I should talk to Ms. Fisch and Mr. Normand about this – is send out a notice that is our position as to what we benefitted the class. There are other positions.  And that they take a different position, I'm comfortable with that." Ms. Fisch: "[W]e would be happy to sit down with Mr. Ross, perhaps with the assistance of the Special Master, to try to propose some new language along the lines of what you're

The Revised Notice also fails to comply with all of the technical requirements of Local Civil Rule 23.1.  While it includes the names of the attorneys who are seeking fees – the Coleman Law Firm and the law firm of Pavalon, Gifford & Laatsch – and the address of the Coleman law firm, it does not include the address of the latter law firm.  Moreover, while it includes the total amount of attorney's fees sought – $1.5 million – it fails to include the specific amounts that will be sought by each of the two firms, or whether any fee sharing agreement has been entered into between the two law firms or by either.

Thus, counsel for the Self-Funded Subclass are directed to amend the Revised Notice to include:  (1) an explanation of the fact that counsel seeks an award of attorney's fees that would go beyond the 30% cap set forth in the Settlement Agreement and approved by the Court of Appeals, and that, if approved, would result in the Self-Funded Subclass paying more in attorneys' fees that the Insured Subclass; (2) an explanation of which portion of the $4.7 million benefit is the result of the increased discount, and which is the result of the reclassification of certain plans, and that there are conflicting positions regarding whether the reclassification was the result of the efforts of counsel for the Self-Funded Subclass; (3) the address of the law firm of Pavalon, Gifford & Laatsch; (4) the specific amount of fees sought by each of the two law firms; and (5) a statement regarding any fee sharing agreement (or lack thereof) entered into or to be entered into by both or either of the two law firms.  Counsel for the Self-Funded Subclass must submit the amended Revised Notice to the Court for its final approval within 21 days of the date of this Memorandum Decision and Order.

My direction that the proposed Revised Notice be redrafted as described above should

---

suggesting.").)

not be interpreted as a conclusion that fees exceeding the 30% cap, or a fee arrangement

resulting in one Subclass paying more in fees than the other, are permissible.  I will make those

determinations with the benefit of the views of the Self-Funded Subclass after the fee application

has been filed and the hearing thereon has been held.


## IV.  Motion for Reconsideration

The Blumenthal Plan filed Objections to the Modified Allocation Plan on May 6, 2008,

on the basis that the notice provisions failed to meet the requirements of both Rule 23 and due

process.  (Doc. 171.)  Specifically, the Blumenthal Plan argued that the Notice of Amendment,

which was sent only to the Insured Subclass to inform them of the Modified Allocation Plan, was

inadequate because it should have been sent to all potential Class members, including the 241

plans which, like the Blumenthal Plan, opted out of the Class.  The Blumenthal Plan argued that

the Self-Funded Subclass and the opt-out plans were wrongly deprived of the opportunity to

respond to the Modified Allocation Plan, and that the opt-out plans should have been permitted

to opt back in if they chose to do so.

Both Subclasses filed briefs in response to the Objections and in support of the Modified

Allocation Plan, arguing that (1) the Blumenthal Plan, having opted out, did not have standing

object to the Settlement Agreement; (2)  the change to the Settlement Agreement was not

material and did not, therefore, require the issuance of a new Class notice, but rather notice only

to those adversely affected by the change; (3) the Blumenthal Plan, which is a self-funded plan,

suffered no loss and is therefore not entitled to notice; (4) permitting opt-outs to opt back in

would be unfair and prejudicial to the entire Class; and (5) reissuing notice to all potential class

members would be unduly burdensome and costly, outweighing any potential benefit.  (Docs. 172, 173.)

At the May 20, 2008 hearing, Judge Brieant ruled that "for the reasons which have been argued," the Blumenthal Plan's rights were "not impaired in any way" and it was not entitled to notice of the Modified Allocation Plan.  (May 20, 2008 Hr'g Tr. 32:15-21.)  He also noted that the Second Circuit's opinion had not required such notice.  (*Id.* 32:14-15.)  Judge Brieant observed several times during the hearing that regardless of the fate of the Settlement Agreement, the Blumenthal Plan was free to negotiate its own settlement with Medco or continue to pursue its individual action against it.  (*Id.* 14:12-16, 16:24-17:5, 17:17-18, 32:17-21.)  The Blumenthal Plan filed a Motion for Reconsideration of this decision on October 23, 2008.  (Doc. 179.)

### A.  Standard of Review

Motions for reconsideration are within the sound discretion of the district court.  *Reddy v. Salvation Army*, No. 06-CV-5176, 2008 U.S. Dist. LEXIS 87137, at *4 (S.D.N.Y. Oct. 27, 2008).  "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995); *accord Rafter v. Liddle*, 288 F. App'x 768, 769 (2d Cir. 2008); *see* S.D.N.Y. Local Civ. R. 6.3.  Pursuant to Local Civil Rule 6.3, "[a] notice of motion for reconsideration . . . of a court order determining a motion shall be served within ten (10) days after the entry of the court's determination of the original motion," and the moving party must "set[] forth concisely the matters or controlling

decisions which counsel believes the court has overlooked."  Motions for reconsideration "are not vehicles for taking a second bite at the apple."  *Rafter*, 288 F. App'x at 769 (internal quotation marks omitted).

### B.  Analysis

#### 1. Timeliness of Motion for Reconsideration

As an initial matter, it must be determined whether the Motion for Reconsideration was timely filed pursuant to Local Civil Rule 6.3, "which requires a party seeking to move for reconsideration to serve its motion within ten days after the docketing of the court's determination of the original motion."  *Camacho v. City of Yonkers*, 236 F.3d 112, 114 (2d Cir. 2000).  The Blumenthal Plan argues that its Motion is timely because Judge Brieant's May 20, 2008 ruling from the bench was never docketed and, therefore, the time to file a motion for reconsideration has not passed.  Because Judge Brieant's ruling on the Blumenthal Plan's Objections was, indeed, never entered within the meaning of Local Rule 6.3, I deem the Motion for Reconsideration timely.  *See Banco Central Del Paraguay v. Paraguay Humanitarian Found.*, No. 01-CV-9649, 2007 WL 2493684, at *1 n.1 (S.D.N.Y. Sept. 5, 2007) (motion for reconsideration was timely when filed within ten days of entry of order dismissing claims, even though order had been issued over two months earlier)*; United States v. Billini*, No. 99-CR-156, 2006 WL 3457834, at *2 (S.D.N.Y.  Nov. 22, 2006) (June 22, 2006 motion for reconsideration of order signed April 27, 2006, but not entered until June 9, 2006, was timely); *Gates v. Local Union No. 14 of the Int'l Union of Operating Eng'rs*, No. 85-CV-3760, 1988 WL 16001, at *1 (S.D.N.Y. Feb. 19, 1988) (motion for reconsideration timely where filed more than ten days after court dismissed action on summary judgment, but within ten days of summary judgment order

being docketed); *see also Schroeder v. McDonald*, 55 F.3d 454, 459 (9th Cir. 1993) (motion for reconsideration timely where judgment never entered and clock on ten-day limit therefore never began to run).

### 2.   Merits of Motion for Reconsideration

The Blumenthal Plan argues that Judge Brieant based his decision regarding the adequacy of the Notice of Amendment on considerations related only to the opt-out Plans and thus overlooked significant facts – specifically, the effect of not providing the Notice of Amendment to:  (1) the 787,000 class members who did not opt out but also did not file claim forms, and (2) an untold number of plans that became Class members after issuance of the 2003 Notice.  (Mem. of Law in Supp. of Mot. for Recons. 17.)  In addition, the Blumenthal Plan asserts that Judge Brieant misunderstood controlling law – specifically, the Court of Appeals's ruling regarding the Settlement Agreement – in that he wrongly based his decision on the Court of Appeal's silence regarding notice to the Class of any changes to the Settlement Agreement on remand.  It asserts that the Court of Appeals would not have directed notice because it was not aware whether any change in allocation would take place.  (*Id.* 18.)

Contrary to the Blumenthal Plan's contentions, Judge Brieant did not base his decision regarding the adequacy of the Notice of Amendment entirely on the effect of such notice (or the lack thereof) on the opt-out Plans.  (*Id.* 17.)  Rather, Judge Brieant ruled that the Blumenthal Plan was not entitled to notice "for the reasons which ha[d] been argued."   (May 20, 2008 Hr'g Tr. 32:15-16.)  Judge Brieant heard many arguments in support of and in opposition to the Blumenthal Plan's Objections during the May 20, 2008 hearing, including the Blumenthal Plan's argument regarding the impropriety of issuing the Notice of Amendment only to the insured

plans that had filed claims, rather than to the 241 plans that opted out and the 787,000 class members who did not file claim forms or opt out.  (*Id.* 11:25-12:7, 16:4-19, 18:10-19:20.)  The Blumenthal Plan's position – that the Settlement Agreement was dramatically changed requiring notice be sent to the entire potential Class; that these changes warranted giving the opt-out Plans and those that did not file claim forms the option of opting back in; and that notice to the entire potential class would not be unduly burdensome or costly – was made abundantly clear.  (*Id.* 14:17-19:20.)  In response, counsel for the Insured and Self-Funded Subclasses presented many arguments in support of its position that the Notice of Amendment had to be issued only to the Insured Subclass:  the original notice did not specify the amount any class member would receive and, therefore, a relatively small change to the allocation of Settlement Funds between the subclasses is not a material change to the Settlement Agreement requiring notice to the entire potential Class; those class members adversely affected by the Modified Allocation Plan (the insured plans that had filed claims) had been notified with no objections; permitting additional claim forms to be filed would unfairly dilute the recovery of those who had already filed; the cost of sending the Notice of Amendment to all of the potential Class members would outweigh any benefit; and the Court of Appeals left undisturbed and sought to preserve all aspects of the Settlement Agreement except the certification of the Self-Funded Subclass and the allocation of the Settlement Fund.[13]  (*Id.* 11:22-14:4, 19:21-25:3, 28:14-30:7.)  Judge Brieant also had the

---

[13]  Counsel for the Self-Funded and Insured Subclasses also advanced other arguments specifically related to the opt-out plans in support of their position:  the Blumenthal Plan, as an opt-out Plan, did not have standing to object to any portion of the Settlement Agreement; the Blumenthal Plan suffered no loss due to the change in the Settlement Agreement and was not, therefore, entitled to notice of the change; the opt out plans made a considered decision to opt out altogether rather than remain in the Class and object to the 55% discount; it would be inequitable for the Blumenthal Plan to opt back into the class at this late stage, after a change in

benefit of counsel's written submissions – specifically, the Blumenthal Plan's Objections to the
Second Amendment to the Settlement Agreement (Doc. 171), the Response of the Self-Funded
Plan Subclass to the Blumenthal Plan's Objection (Doc. 172) and Insured Subclass's
Memorandum in Support of the Modified Plan of Allocation (Doc. 173) – which included all of
these arguments.  Thus, Judge Brieant ruled only after being presented with a number of
arguments both orally and in writing, including the Blumenthal Plan's argument regarding the
impropriety of not issuing notice to those Plans that did not file claim forms.  Having forcefully
advanced this argument before Judge Brieant, the Blumenthal Plan is not entitled to a second bite
at the apple before this Court.  *See Rafter*, 288 F. App'x at 769.

     The Blumenthal Plan also asserts that Judge Brieant failed to consider the effect of not
issuing the Notice of Amendment to those "untold number of Class Members who executed
contracts with Medco after the 2003 Notice was issued."  (Reply Mem. of Law in Supp. of Mot.
for Recons. 3.)  The Blumenthal Plan did not make this argument in its original Objections to the
Second Amendment to the Settlement Agreement.  Having failed to make the argument the first
time around, it is precluded from doing so now, because Local Rule 6.3 "has been interpreted as
precluding arguments raised for the first time on a motion for reconsideration."  *Caribbean*
*Trading & Fidelity Corp. v. Nigerian Nat'l Petroleum Corp.*, 948 F.2d 111, 115 (2d Cir. 1991);
*accord Flaherty v. Filardi*, No. 03-CV-2167, 2009 U.S. Dist. LEXIS 22641, at *35 (S.D.N.Y.
Mar. 20, 2009) ("A party seeking reconsideration is not supposed to treat the court's initial

---

the law that arguably negatively affects its chances for recovery, whereas the opt-in plans had
less information when they made their choices on how to proceed; and the opt-out plans did not
know how much they would have received under the Settlement Agreement when they opted out
and still do not know how much they would receive under the Modified Allocation Plan.

decision as the opening of a dialogue in which that party may then use such a motion to advance

new theories or adduce new evidence in response to the court's rulings." (internal citations and

quotation marks omitted)).

The Blumenthal Plan's contention that it is entitled to reconsideration on the basis that

Judge Brieant misunderstood the Court of Appeals' decision is also unavailing, because "a party

may not seek reconsideration simply by arguing that a judge misinterpreted case law in his

earlier decision." *Almonte v. City of Long Beach*, No. 04-CV-4192, 2005 U.S. Dist. LEXIS

37528, at *5 (E.D.N.Y. Aug. 16, 2005).  Moreover, it does not appear that Judge Brieant

misunderstood the Court of Appeal's decision.  He simply stated his belief that if the Court of

Appeals had thought that notice to the entire class of any change in the allocation plan was

necessary, it would have directed that such notice be issued.  (May 20, 2008 Hr'g Tr. 27:16-17,

32:14-15.)  While the Blumenthal Plan may disagree with Judge Brieant's view, it has not shown

that he overlooked any controlling law.

Furthermore, Judge Brieant's understanding of the Court of Appeals' decision could not

"reasonably be expected to alter [his] conclusion," *Shrader*, 70 F.3d at 257, because he made

clear that his ruling was based on other considerations as well, including, apparently, the

Blumenthal Plan's lack of standing.  (May 20, 2008 Hr'g Tr. 32:14-17 ("[A]nd were it so, the

Second Circuit would have said so and it didn't say so.  And for the reasons which have been

argued, the Court takes the position that [the Blumenthal Plan's] rights are not impaired in any

way . . . .").)  He explicitly stated a number of times during the hearing that the Blumenthal Plan

had opted out and, therefore, still had an opportunity to either settle directly with Medco or

continue to pursue its own individual action.  Having these options, the Blumenthal Plan's

-28-

"rights were not impaired in any way" by the Modified Allocation Plan or any other aspect of the Settlement Agreement and, therefore, it lacked standing to object to it.  (*Id.* 14:12-16, 16:24-17:5, 26:10-11.)

In sum, the Blumenthal Plan has failed to present the Court with any facts or controlling law that were overlooked by Judge Brieant and which would have altered his decision regarding the Blumenthal Plan's Objections.[14]  Although he did not discuss his reasoning at length, he indicated that his ruling was based on "the reasons which ha[d] been argued," and there is no reason for this Court to believe that Judge Brieant did not consider all of the facts and arguments that were before him.  *See Henry v. Wyeth Pharms., Inc.*, No. 05-CV-8106, 2007 U.S. Dist. LEXIS 93694, at *19 (S.D.N.Y. Dec. 19, 2007) ("[A] court is not required to recite in its written opinion every fact and argument in the record before it."); *Woodward & Dickerson v. Kahn*, No. 89-CV-6733, 1992 U.S. Dist. LEXIS 17032, at *6 (S.D.N.Y. Nov. 5, 1992) ("Defendants erroneously assume that the Court's failure to discuss a particular item in the written decision reflects a concomitant failure to consider fully all facts and documents that were in the record."); *see also* Fed. R. Civ. P. 52(a) ("The court is not required to state findings or conclusions when

---

[14]  Defendants argue that the law of the case doctrine applies and that I should revisit Judge Brieant's decision only if there has been an intervening change in the law, the availability of new evidence, or the need to correct a clear error.  (Mem. in Opp'n to Blumenthal's Mot. for Recons. 3.)  The law of the case doctrine is, however, discretionary and "where the prior decision was made by a different judge, the principle generally does not limit a court's discretion to reconsider the issue."  *Steinborn v. Daiwa Secs. Am.*, No. 92-CV-782, 1995 U. S. Dist. LEXIS 19165, at *2 n.1 (S.D.N.Y. Dec. 26, 1995) (internal quotation marks omitted); *accord Stuto v. Herman*, 181 F.3d 83, 83 (2d Cir. 1999) ("The law of the case doctrine 'is, at best, a discretionary doctrine, which does not constitute a limitation on the court's power but merely expresses a general reluctance, absent good cause, to reopen rulings that the parties have relied upon.'"  (quoting *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d Cir. 1998))).

ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other

motion.").  Where, as here, "the movant fails to show that any controlling authority or facts have

actually been overlooked, and merely offers substantially the same arguments he offered on the

original motion, the motion for reconsideration must be denied."  *Henry*, 2007 U.S. Dist. LEXIS

93694, at *5.[15]

　　　　Moreover, even if I were to grant the Motion for Reconsideration, I would not reach a

different result.  In order to have standing, the Blumenthal Plan would have to suffer "plain legal

prejudice" from the action it wishes to challenge – *i.e.*, it would have to be stripped of "a legal

claim or cause of action."  *In re Vitamins Antitrust Class Action*, 215 F.3d 26, 31 (D.C. Cir.

2000).  "Although the specific point at which the Blumenthal Plan opted out is not clear, it is

apparent that the trustees of the Blumenthal Plan were no longer parties to the class action at the

time of the final judgment certifying the class and approving the Settlement Agreement."  *Cent.*

*States Se. & Sw. Areas Health & Welfare Fund*, 433 F.3d at 203.  By opting out of the

Settlement Agreement and preserving its right to litigate its claim against Medco independent of

the Class, the Blumenthal Plan will not suffer "plain legal prejudice" from the Modified

---

[15]  The June 16, 2008 letter to Judge Brieant from Owens Corning, which asks the Court to order that notice of the Modified Allocation Plan be provided to all potential class members, does not change this result.  The letter states that Owens Corning opted out of the Settlement Agreement because it felt that the allocation of the settlement funds between the Insured and Self-Funded Plans was unjust, and that now that the allocation has been altered in a way that it believes is more fair, it would like notice of the Modified Allocation Plan and an opportunity to opt back in.  First, this letter was sent after Judge Brieant's decision and "[a] motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the [c]ourt . . . ."  *Grand Crossing, L.P. v. U.S. Underwriters Insur. Co.*, No. 03-CV-5429, 2008 U.S. Dist. LEXIS 80833, at *8 (S.D.N.Y. Oct. 6, 2008).  In addition, as discussed below, Owens Corning, like the Blumenthal Plan, lacks standing to object to any portion of the Settlement Agreement, including its notice provisions.  *See In re Vitamins Antitrust Class Action*, 215 F.3d 26, 28-31 (D.C. Cir. 2000).

Allocation Plan.  Thus, because the Blumenthal Plan is not bound by the Settlement Agreement, it lacks standing to object to any portion of the it, including the Modified Allocation Plan and issuance of the Notice of Amendment.  *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 55 F. App'x 498, 500 (10th Cir. 2003) (having opted out of settlement, plaintiffs lacked standing to object to it); *In re Vitamins Antitrust Class Action*, 215 F.3d at 28-31 (opt-out plaintiffs had no standing to object to settlement agreement where they fully preserved their right to litigate their claims independently); *Mayfield v. Barr*, 985 F.2d 1090, 1092-93 (D.C. Cir. 1993) (same); *Trew v. Volvo Cars of N. Am., LLC*, No. 05-CV-1379, 2007 U.S. Dist. LEXIS 55305, at *7 (E.D. Cal. July 31, 2007) (opt-out plaintiffs did not have standing to object to settlement agreement).[16]  The Second Circuit recognized as much when the Blumenthal Plan's counsel attempted to appeal various aspects of Judge Brieant's May 25, 2004 Order approving the Settlement Agreement.  It struck the appeal (other than the portion dealing with counsel's fee award) because the Blumenthal Plan had opted out of the Settlement Agreement and therefore lacked standing to object to it.  (Feb. 17, 2005 Order of the Court of Appeals for the Second Circuit.)

   In addition, a number of courts have found that notice regarding modifications to a settlement agreement need only be issued to those who are materially and adversely affected by

---

   [16]  Further, were it necessary to reach the issue, I would be sympathetic to Class counsel's argument that gamesmanship would be encouraged by permitting plans that opted out to opt back in now that the legal landscape has changed.  If the Blumenthal Plan could "sit back, test the litigation waters for four years free of [the] *res judicata* [effect of being in the class], pursue [its] chance for a bigger recovery from Medco than [it] might have received as a settling class member, and scurry back to the certainty of a share of the class settlement if things don't seem to be going well" (Resp. of Self-Funded Plans Subclass to Harry Blumenthal's Mot. for Recons. 4), it would indeed have "rights superior to those of the self-funded plans which filed timely claims to the Settlement Fund in 2004," (*id.*), and "took the risk that their champions might lose their objection and that the self-funded plans' share of the settlement fund would be determined under the original allocation scheme" (*id.* 5).

it.  *See Nilsen v. York County*, 382 F. Supp. 2d 206, 221 n.9 (D. Me. 2005) (notice of amendment

to settlement agreement required only as to those class members negatively affected by it); *Spark*

*v. MBNA Corp.*, 289 F. Supp. 2d 510, 515 n.9 (D. Del. 2003) ("A new class notice is not

required to be sent, as it is only necessary when class members' rights would be materially and

negatively affected compared to the rights they had under the original notice."); *In re*

*Bankamerica Corp. Secs. Litig.*, 227 F. Supp. 2d 1103, 1107 (E.D. Mo. 2002) (notice of revised

plan of allocation properly sent only to those class members whose rights were materially

affected); *In re Metro. Life Ins. Co. Sales Practices Litig.*, MDL No. 1091, 1999 U.S. Dist.

LEXIS 22688, at *41 (W.D. Pa. Dec. 28, 1999) (notice of amendment unnecessary where it

would not impair, but rather would enhance, rights of class members).  Thus, it was appropriate

to issue notice of the Modified Allocation Plan only to the Insured Subclass, the members of

which are the ones materially and adversely affected by it.


## V.  The Herman Mathis Group's Motion for Attorneys' Fees

### A.  Background

The Herman Mathis Group claims that on this and related actions it has performed

approximately 6,000 hours of work which directly benefitted the Class and, in particular, the

Self-Funded Subclass.  On the basis of these efforts, it seeks attorneys' fees in the amount of

$637,500, which represents 5% of the total $12.75 million awarded to Class counsel, plus an

additional $169,817.43 in costs.  It notes that while its hours of work have exceeded those of the

Lowey Firm, it has limited its request to $637,500, the same amount that the Lowey Firm

requested for its efforts.[17]  The Court heard oral argument on the Herman Mathis Group's

Motion for Attorneys' Fees on May 20, 2009.

     The Herman Mathis Group contends that it made significant efforts on behalf of the

Class.  In 2001 and 2002, the Herman Mathis Group filed five lawsuits against Medco on behalf

of individual plan beneficiaries, all of which were eventually transferred to and consolidated

with this action before Judge Brieant.[18]  Beginning in 2002 and throughout 2003, the Herman

Mathis Group argues, it raised concerns about certain aspects of the Preliminary Settlement

Agreement, including:  (1) the inclusion of plan beneficiaries and the release of their claims with

no notice, (2) ambiguities in the scope of the release regarding the self-funded plans' contract

claims, and (3) the preferential treatment of insured plans over self-funded plans.  Eventually,

the Preliminary Settlement Agreement was amended by excluding plan participants, including a

provision regarding the preservation of contract claims not preempted by ERISA, and

discounting the insured plans' share of the settlement agreement by 55%.  Thereafter, the

Herman Mathis Group claims that it sought but never received from the settling parties detailed

information regarding the allocation of the Settlement Fund between the insured and self-funded

---

    [17]  Rather than being awarded separate fees by the court, the Lowey Firm reached an agreement with Class counsel regarding its fees.  "From their fee award, settling Plaintiffs' counsel agreed to absorb payment of a reasonable fee to [the Lowey Firm], which had requested a fee award in the amount of $637,500, a 1.317 multiplier of their lodestar of $483,947.50." *Cent. States Se. & Sw. Areas Health & Welfare Fund*, 433 F.3d at 194.  Judge Brieant approved Class counsels' request for fees and the Court of Appeals affirmed it.  *Id.*  Unlike the Lowey Firm, however, the Herman Mathis Group was unable to reach an agreement with Class counsel regarding its request for fees.  (Reply Br. in Further Supp. of the Herman Mathis Group's Fee Application ("Reply Br.") 6.)

    [18]  The Herman Mathis Group also filed two other cases, one on behalf of a plan trustee who opted out of the Settlement Agreement, and another one pursuant to California state law, which are not covered by the Settlement Agreement.  (Reply Br. 3 n.2.)

plans.  In 2003, it objected to the allocation of the Settlement Funds (among other things) at the fairness hearing and filed a thirty-page brief, which included an argument regarding the conflict of interest presented by the insured plans' representation of the self-funded plans.  (Doc. 47.) The Herman Mathis Group also attempted to opt out of the Settlement Agreement the plans in which its individual beneficiaries participated, but was not permitted to do so because Judge Brieant found that individual plan beneficiaries lacked authority to act on behalf of those plans. (May 25, 2004 Order 9-10.)  Ultimately, as noted, in 2007 the Court of Appeals for the Second Circuit directed the certification of the Self-Funded Subclass, and counsel for the two Subclasses thereafter negotiated an increase in the discount to the Insured Subclass' share of the Settlement Fund from 55% to 85%.

The Herman Mathis Group claims that its efforts have resulted in the following benefits to the Class:  (1) the cases filed by the Herman Mathis Group induced Medco to settle, (2) the Preliminary Settlement Agreement was amended to exclude individual plan beneficiaries and to preserve contract claims not preempted by ERISA, (3) individual plan beneficiaries were determined to have standing to sue and settle claims against breaching fiduciaries, (4) the insured plans' share of the Settlement Fund was discounted by 55%, (5) the Court of Appeals directed the creation of the Self-Funded Subclass, and (6) the discount to the Insured Subclass' share of the Settlement Fund was increased from 55% to 85%.

### B.  Legal Standard

Where attorneys succeed "in creating a common fund from which members of a class are compensated for a common injury inflicted on the class . . . . the attorneys whose efforts created the fund are entitled to a reasonable fee – set by the court – to be taken from the fund."

*Goldberger v. Integrated Res.*, 209 F.3d 43, 47 (2d Cir. 2000); *accord Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999).  Courts use two different methods to determine the reasonableness of attorneys' fees:  the lodestar method and the percentage method.  *Goldberger*, 209 F.3d at 47.  Under the lodestar method, "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate."  *Id.*  Once this calculation has been done, "the district court may, in its discretion, increase the lodestar by applying a multiplier based on other less objective factors, such as the risk of the litigation and the performance of the attorneys."  *Id.* (internal quotation marks omitted).  Under the percentage method, the "court sets some percentage of the recovery as a fee" by "look[ing] to the same less objective factors that are used to determine the multiplier for the lodestar."  *Id*. (internal quotation marks omitted).  Regardless of the method used, the district court should be guided by "the traditional criteria in determining a reasonable common fund fee, including:  (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  *Id.* at 50; *see In re Excess Value Insur. Coverage Litig.*, 598 F. Supp. 2d 380, 385 (S.D.N.Y. 2005).  In no circumstances may a fee award exceed what is reasonable.  *Goldberger*, 209 F.3d at 47.  The determination of the reasonableness of an award of attorneys' fees is within the sound discretion of the trial court.  *Id.*

Recognizing the "valuable and important role" of objectors to class action settlement agreements, the Court of Appeals has held that objectors are "entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the

settlement was improved as a result of their efforts." *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir. 1974); *accord In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238, 2004 U.S. Dist. LEXIS 8737, at *12 (S.D.N.Y. April 2, 2004). "[A] material benefit to the class is the *sine qua non* for an attorney's entitlement to an award of fees from the common fund." *In re Holocaust Victim Assets Litig.*, 424 F.3d 150, 157 (2d Cir. 2005). The party seeking attorneys' fees bears the burden of establishing entitlement to an award. *Savoie*, 166 F.3d at 463; *In re Excess Value Insur. Coverage Litig.*, 598 F. Supp. 2d at 385.

### C. Analysis

#### 1. Timeliness of the Herman Mathis Group's Fee Application

Federal Rule of Civil Procedure 23(h), which governs motions for attorneys' fees in class actions, permits the court to set a time frame for the filing of a motion for attorneys' fees. Fed. R. Civ. P. 23(h)(1) ("A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets."); advisory committee's notes on Rule 23(h) ("The court should direct when the fee motion must be filed."). The attorneys involved in this matter filed applications for the award of attorneys' fees in late 2003 and early 2004. The Herman Mathis Group apparently decided not to do so at that time.[19] Now, over four years later, it has decided to seek fees for the work it has done in connection with this matter since 2001. The Herman Mathis Group has failed, however, to adequately explain why its application is timely, given that the time frame for doing so has long passed, or how, given that the Herman Mathis Group was not retained to represent the new Self-Funded Subclass, it falls

---

[19] In addition, it did not appeal any aspect of Judge Brieant's May 25, 2004 Order, approving the Settlement Agreement and awarding attorneys' fees to Class counsel.

within the scope of the remand directed by the Court of Appeals, which "note[d] in passing that counsel retained to represent the interests of the new subclass on remand also may be entitled to recover reasonable attorneys' fees." *Cent. States Se. & Sw. Areas Health & Welfare Fund*, 504 F.3d at 249.  In support of the timeliness of its application, the Herman Mathis Group states that it did not file an application for fees in 2003 because its "claim for a fee was not ripe" in that Judge Brieant had not, as the Court of Appeals did later, found a conflict of interest between the insured and self-funded plans.  (Reply Br. 13.)  This justification is insufficient given that its fee application is based not only on benefits to the Self-Funded Class, but also on results it purportedly achieved for other members of the Class before the Court of Appeals' 2007 decision. For these reasons, the Court is doubtful of the timeliness of the Herman Mathis Group's fee application.  The Court also believes the remand from the Second Circuit does not permit consideration of fee applications by counsel other than Class counsel.  In an excess of caution, however, I will consider the merits of the application.

### 2.  Benefits to the Class

The Herman Mathis Group claims that it is entitled to $637,500 in attorneys's fees on the basis that it induced Medco to settle, caused certain improvements to be made to the Settlement Agreement, protected the rights of individual plan beneficiaries, and advanced the interests of the self-funded plans.

### a. Inducement of the Preliminary Settlement Agreement

The Herman Mathis Group filed seven actions on behalf of plan participants and plan trustees in 2001 and 2002, five of which were eventually consolidated with other earlier-filed related cases against Medco and transferred to this District.  (*Id.* 3.)  While the Herman Mathis

Group argues that the filing of these cases induced Medco to reach the Preliminary Settlement

Agreement in 2002, it provides no evidence to support it.  It claims only that it was no

coincidence that the lawsuits filed in New York by other law firms had "wallowed" for over four

years with little progress until the Herman Mathis Group began filing lawsuits around the

country.  (*Id.* 15.)  Notably, the Herman Mathis Group does not claim that it took part in any of

the negotiations leading up to the Preliminary Settlement Agreement.  (*Id.* Ex. 8 (Herman Mathis

Group was not provided an opportunity to participate in any settlement negotiations prior to

November 19, 2002).)  Rather, it admits that it learned of the Preliminary Settlement Agreement

only when that agreement was announced by other counsel during its first appearance at a

conference before Judge Brieant.  (*See id.* 7-8.)  Thus, the Herman Mathis Group has not shown

that its efforts induced the Preliminary Settlement Agreement.  Moreover, if the Herman Mathis

Group believed that its efforts induced the Preliminary Settlement Agreement, it is unclear why

it did not seek fees in 2003.  It makes little sense to admit on the one hand that its application for

fees was "not ripe" in 2003 and "had no basis" until 2007, but on the other, to base such an

application on efforts made and results purportedly achieved well before that time.  (*Id.* 13-14.)

### b.  Amendment of the Preliminary Settlement Agreement

The Herman Mathis Group contends that due to its efforts, the Preliminary Settlement

Agreement was revised to benefit the Class.  (*Id.* 8.)  It asserts that after it voiced objections to

the Preliminary Settlement Agreement, it was withdrawn and replaced with the Settlement

Agreement, which excluded individual plan participants from the settlement and preserved

contract claims not preempted by ERISA.  While this may be true, the Herman Mathis Group

does not provide an explanation of how its efforts actually *caused* those amendments given that

-38-

other law firms also raised these concerns.  Especially telling in this respect is the fact that the

Herman Mathis Group did not seek fees on the basis of these efforts during the time frame set by

Judge Brieant, and admits that any such application at that time would have been without merit.

It appears that the application is still without merit, as nothing has happened in the interim period

which has had any effect on those efforts or the results purportedly achieved by them.

### c.  Standing of the Individual Plan Beneficiaries

The Herman Mathis Group consistently argued that the individual plan beneficiaries had

standing to sue as well as to opt their plans out of the Settlement Agreement.  On November 13,

2003, the individual plan beneficiaries represented by the Herman Mathis Group filed a

Statement of Intent to Opt Out with Conditional Objection to the Proposed Settlement and

Incorporated Memorandum in Support with Motion to Intervene in which they advanced these

arguments.  (Doc. 47.)  In his May 25, 2004 Order approving the Settlement Agreement,

however, Judge Brieant rejected this argument, finding that the plan participants "did not have

authority to act on behalf of the plans that they were attempting to opt-out of the settlement"

because the "class consists solely of Plans," and denied the plan participants' motions and

objections "for want of standing."  (May 25, 2004 Order 9-10.)  Thus, the Herman Mathis Group

was unsuccessful in opting out of the Settlement Agreement the plans of its individual

beneficiary clients.  The Herman Mathis Group did not appeal Judge Brieant's decision.

The Coleman Firm, the Law Office of Linda J. Cahn and law firm of Robins, Kaplan,

Miller & Ciresi LLP did, however, appeal Judge Brieant's ruling on behalf of their clients.  On

appeal those firms argued that the remaining named plaintiffs, including individual plan

beneficiaries and plan trustees, did not have standing because they failed to demonstrate injury in

fact sufficient to satisfy Article III.  The Court of Appeals remanded the case to the district court to resolve in the first instance whether the named plaintiffs had constitutional standing.  *Cent. States Se. & Sw. Areas Health & Welfare Fund*, 433 F.3d at 203.  On remand, Judge Brieant determined that one named plaintiff, a plan trustee, had standing to represent the Class and "that all of the Individual Plaintiffs ha[d] representational standing in the right of their Plans, which ha[d] Article III standing."  (Aug. 10, 2006 Mem. Decision and Order 22.)  Although the Herman Mathis Group filed a brief in the district court on remand arguing that the individual plan beneficiaries had constitutional standing, it does not appear that its brief did anything more than repeat those arguments advanced by Class counsel.

Thereafter, the Court of Appeals resumed jurisdiction of the case.  The Herman Mathis group submitted to the Court of Appeals an amicus brief in support of the individual plan beneficiaries' standing.  The Herman Mathis Group also apparently communicated its ideas to Abbey Gardy LLP and Boies, Schiller & Flexner LLP, and provided them with materials to assist them in their efforts to establish the Article III standing of their plan participant clients. The Court of Appeals ultimately upheld Judge Brieant's decision with respect to his finding that the plan trustee had constitutional standing.  Having decided that at least one named plaintiff had constitutional standing, the Court of Appeals determined that it "need not reach the issue of standing as it pertain[ed] to any of the other named Plaintiffs . . . ."  *Cent. States Se. & Sw. Areas Health & Welfare Fund*, 504 F.3d at 243.  Thus, the Court of Appeals never decided whether the individual plan beneficiaries had standing.  The Herman Mathis Group's brief was not acknowledged by the Court of Appeals in its decision, the issues discussed in it were not reached, and the arguments made therein were redundant of those made by Class counsel.  Thus,

-40-

because the Herman Mathis Group's efforts in the District Court and the Court of Appeals did not ultimately have any effect on the outcome, the Herman Mathis Group has not shown that its efforts with respect to the constitutional standing of the individual plan beneficiaries benefitted the Class.

### d. Creation of the Self-Funded Subclass and Increase of Discount to the Insured Subclass' Share of the Settlement Fund

Finally, the Herman Mathis Group argues that it benefitted the Self-Funded Subclass by achieving:  (1) the initial 55% discount to the insured and capitated plans' share of the Settlement Fund, (2) the certification of a separate Self-Funded Subclass, and (3) the eventual 85% discount to the Insured Subclass' share of the Settlement Fund.  The Herman Mathis Group fails, however, to show that those achievements were the result of its efforts.  According to the Herman Mathis Group, it has argued consistently, since the submission of the preliminary settlement agreement in 2002, that the self-funded plans were not adequately represented. However, it is clear that other lawyers, including Linda Cahn, who was involved in this case from the beginning, and the Coleman Firm, which became involved in 2003, have also been advancing arguments on behalf of the self-funded plans during this litigation.  The Herman Mathis Group contends that it has repeatedly requested from Class counsel detailed information regarding damage models and estimates supporting the $42 million settlement as well as calculations and explanations of the 55% discount.  There is no indication, however, that it received this information or that its requests had any effect on the amount of the Settlement Fund or the discount.  The $42 million settlement was negotiated by other counsel without the Herman Mathis Group's participation, approved by Judge Brieant over the Herman Mathis Group's objections, and affirmed by the Court of Appeals.  The 55% discount was, likewise, negotiated

-41-

by other counsel and approved by Judge Brieant over the Herman Mathis Group's objections.

Similarly, the Herman Mathis Group's efforts to have a separate subclass of self-funded plans

created in the District Court were unsuccessful.  The Self-Funded Subclass was created and the

discount increased to 85% only after a successful appeal to the Court of Appeals by law firms

other than the Herman Mathis Group.   In addition, there is no indication that following the

Court of Appeals' second remand, the Herman Mathis Group was involved in the any of the

negotiations that led to the 85% discount.  Although the Herman Mathis Group undoubtedly did

work and advanced arguments on behalf of its self-funded plans, it has failed to specify how

these efforts resulted in any ascertainable benefit to the Class.

  The Herman Mathis Group also contends that it benefitted the Class because it was first

to recognize and raise the conflict of interest between the insured and self-funded plans and

originated the idea of creating two separate subclasses.  The Herman Mathis Group has not,

however, carried its burden of establishing that this was so.  The Herman Mathis Group has

presented evidence that it raised this issue as early as 2002 after the Preliminary Settlement

Agreement was reached, but it has not come forward with any evidence to show that it was the

first or only group of attorneys to do so.  At oral argument on this Motion, counsel for the

Insured Subclass disputed the Herman Mathis Group's contentions and represented that the

conflict of interest was recognized and raised by a number of attorneys involved in reaching the

Preliminary Settlement Agreement well before the Herman Mathis Group became involved in

this litigation.  The Court has no reason to doubt that early on, the lawyers involved in

negotiating the Preliminary Settlement Agreement were aware that the insured and self-funded

plans had different claims, which presented different issues, and agreed that the allocation of the

settlement funds would account for those differences.  Indeed, the notion that a class might consist of dissimilarly situated members who would require disparate treatment and/or separate representation is hardly esoteric or obscure.  Thus, having failed to present any evidence to show that its work resulted in any discernible benefits to the Class, the Herman Mathis Group has not carried its burden of establishing its entitlement to fees.  *See Savoie*, 166 F.3d at 463.

Moreover, even if the Herman Mathis Group could demonstrate that it first raised the conflict of interest between the self-funded and insured plans and/or originated the idea of the separate subclasses, I would still not be prepared to award it fees on that basis.  The record shows that the Coleman Firm consistently advanced the interests of the self-funded plans, objected to the Settlement Agreement, successfully appealed Judge Brieant's order approving the Settlement Agreement, sought and was given the opportunity to represent the newly created Self-Funded Subclass, and negotiated the increased 85% discount to the Insured Subclass' share of the Settlement Fund.   While the Court acknowledges the importance of objectors and the fact that they can and often do confer benefits to a class entitling them to fees, *see White*, 500 F.2d at 828, the Court is not prepared to award a fee to the Herman Mathis Group on the basis of an idea, when the actual work was done and results achieved by other attorneys.   Awarding attorneys' fees on the basis of something as abstract as an idea would require the Court to delve into the imprecise and thorny question of who originated an idea and whether others also had it, rather than focusing its inquiry on the concrete question of whether the work of  counsel conferred on the class an ascertainable benefit and improved the settlement, as the law requires.

*See McCoy*, 222 F. App'x at 88.[20]  Furthermore, the Herman Mathis Group has not shown that it is responsible for any intangible benefits to the Class, such as "reintroduc[ing] an adversarial relationship into the settlement" – such a relationship was present via other lawyers and would have been even if the Herman Mathis Group had not participated – or "sharpen[ing] the issues," which were recognized and raised by other counsel.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 2004 U.S. Dist. LEXIS 8737, at *18.

*   *   *

In sum, the Court finds that the Herman Mathis Group has not met its burden of establishing that its efforts resulted in a material benefit to the Class.  Accordingly, its Motion for Attorneys' Fees is denied.


## VI.  Conclusion

For the foregoing reasons, the Modified Allocation Plan is **APPROVED** as fair, reasonable and adequate.  The Parties are directed to consummate the Settlement in accordance with the terms and provisions of the integrated Settlement Agreement.

The Motion to Issue Revised Notice of Application for Attorneys' Fees and Hearing to the Self-Funded Subclass is **DENIED** without prejudice.  Counsel for the Self-Funded Subclass is directed to submit an amended Revised Notice to the Court for its final approval within 21 days of the date of this Memorandum Decision and Order.

---

[20]  Indeed, if origination of the idea were the standard for fees, the lawyers who first sued Medco in this case in 1997 could seek a portion of any fees awarded to the Herman Mathis Group on the ground that when the Herman Mathis Group filed its lawsuits against Medco in 2001 and 2002, it did so on the basis of the idea those lawyers originated in 1997.

The Blumenthal Plan's Motion for Reconsideration is **DENIED**.

The Herman Mathis Group's Motion for Attorneys' Fees is **DENIED**.

The Clerk of Court is respectfully directed to terminate the pending motions (Docs. 174,

179, 188).

**SO ORDERED.**

Dated: June 26, 2009
       White Plains, New York

CATHY SEIBEL, U.S.D.J.